**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STANWICH MORTGAGE ACQUISITION COMPANY VIII, LLC,<br><br>           Plaintiff,<br><br>      -against-<br><br>EQUITY PRIME MORTGAGE, LLC,<br><br>          Defendant. | Case No. 1:24-cv-0771 (DEH) |

**PLAINTIFF'S LOCAL RULE 56.1**
**STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Rule 56.1 of the Local Rules for the Southern District of New York, Plaintiff Stanwich Mortgage Acquisition Company VIII, LLC ("Plaintiff") respectfully submits this Statement of Undisputed Material Facts in support of its concurrently filed motion for summary judgment against Defendant Equity Prime Mortgage, LLC ("Defendant").

**I.**      **ACCEPTED SERVICING PRACTICES FOR AGENCY-INSURED LOANS**

1.      This action concerns the servicing of agency-guaranteed residential mortgage loans or "agency loans" — residential mortgage loans insured against the possibility of borrower default by federal agencies such as the U.S. Department of Veterans Affairs ("VA loans") or the Federal Housing Administration ("FHA loans"). *See* Morley Decl. ¶ 3.[1] This means that if a borrower fails to make payments owed on the agency loan, the relevant agency typically pays the lender to cover those losses, in whole or in part, when the lender's servicer files a claim with the agency. *See id.* This insurance assists homebuyers in obtaining mortgage loans by allowing lenders to offer

---

[1]     The "Morley Decl." or "Morley Declaration" is the Declaration of Terrence Morley in Support of Plaintiff's Motion for Summary Judgment, dated December 1, 2025, filed contemporaneously herewith.

loans to homebuyers with weaker credit histories, smaller down payments, or other financial issues that would otherwise make it difficult for these homebuyers to obtain credit.[2]

2.    Certain standard mortgage servicing practices for VA loans and FHA loans are described in the Morley Declaration submitted by Terrence Morley, a Director, Loss Mitigation at Carrington Mortgage Services, LLC ("Carrington" or "Plaintiff's Servicer").  Carrington is a mortgage company with lending and servicing operations across the United States.  *See* Morley Decl. ¶ 2.  Carrington has conducted over 700 servicing transfers and successfully managed over one million loans in different stages of default, including agency loans and non-agency loans.  *See id.*  As of 2025, Carrington's servicing portfolio included loans with principal balances totaling approximately $169 billion.  *See id.*

3.    As attested to in the Morley Declaration, when a borrower of an agency loan fails to make a payment, the loan servicer engages in loss mitigation efforts, *i.e.*, working with the borrower on mortgage relief options to avoid foreclosure.  *See id.* ¶ 4.  One loss mitigation option is a partial claim, whereby the agency pays claim proceeds to the lender or lender's servicer to cover past-due principal, interest, or other amounts owed by the borrower on a loan in order to bring that loan current, and loan modification documents are entered into by the lender and borrower reflecting the reduced amounts owed by the borrower to the lender.  *See id.* Documentation is also memorialized to indicate the partial claim amounts, which are owed as a non-interest bearing second lien to the respective insurer.  *See id.*

4.    Following agency guidelines and standard practices in the servicing industry, once a servicer determines that a partial claim is the most suitable solution for a borrower of a VA loan

---

[2]    *See, e.g.*, FHA-Insured Home Loans: An Overview, available at https://www.congress.gov/crs-product/RS20530 (last accessed Dec. 1, 2025).

or a FHA loan, the relevant loan modification and partial claim documents are executed.  *See id.* ¶ 5.  Next, the servicer submits the executed loan modification documents (including the original executed version) and the partial claim to the relevant agency.  *See id.*  The agency then verifies and pays the partial claim.  *See id.*  The servicer applies those claim funds to the borrower's loan to bring it current and reinstate the loan.  *See id.*

5.  For VA loans, it is required as part of the claim filing process that the servicer upload an imaged copy of the executed partial claim mortgage and note along with the claim submission.  *See id.* ¶ 6.  The servicer also must send the original recorded partial claim mortgage and note to the VA's servicer within 180 days from the date the borrower signs those documents.  *See id.*  For FHA loans, the servicer has 180 days from the date the borrower signs the partial claim documents to provide those to FHA's servicer, which are subject to post-claim audits.  *See id.*

6.  It is Plaintiff's Servicer's practice, as a prudent mortgage servicer servicing agency loans, to file claims the next business day after a loan modification is complete.  *See id.* ¶ 7.

7.  It is standard to implement the terms of the modification and partial claim once the documents are executed.  *See id.* ¶ 8.  This practice typically involves the servicer advancing funds to cover the past due amounts that are part of the partial claim.  *See id.*  Once the partial claim is certified and paid by the insuring agency, the claim proceeds are used to reimburse the servicer.  *See id.*

## II.     THE MLPA

8.  Plaintiff — an affiliate of Waterfall Asset Management, LLC, an asset manager focused on asset-backed securities, lending, and private equity investments — was formed for the purpose of purchasing agency loans and associated rights to administer those loans, or "servicing rights." Compl. ¶¶ 8-10.  Defendant is a licensed mortgage bank, also known as a non-bank lender,

that originates and sells residential mortgages and servicing rights, including agency loans. Compl. ¶ 13; Answer ¶ 13.

9. Plaintiff, as "Purchaser," and Defendant, as "Seller," entered into a Mortgage Loan Purchase and Sale Agreement, dated as of February 1, 2022 ("MLPA"). Ex. A (the MLPA).[3] Under the MLPA, Defendant agreed to sell, and Plaintiff agreed to purchase, certain agency loans (the "Mortgage Loans"), the proceeds of those loans, and associated servicing rights. *Id.* §§ 2.01, 4.02.

10. The MLPA provided for Defendant's servicer — Third-Party Defendant The Money Source, Inc. (referred to herein as "Defendant's Servicer") — to continue servicing the Mortgage Loans for a brief period after Plaintiff acquired the Mortgage Loans before servicing rights transferred to Plaintiff, defined in the MLPA as the "Interim Servicing Period." *Id.* § 4.01.[4] The "Interim Servicing Period" began on the February 1, 2022 "Closing Date" of the MLPA and extended through the March 22, 2022 "Servicing Transfer Date." *Id.* Art. I, § 4.01; Ex. EE (Defendant's Response to Request for Admission No. 52).

11. The MLPA obligated Defendant to ensure that its servicer followed "Accepted Servicing Practices" during this Interim Servicing Period, including by timely and properly filing any claims on the Mortgage Loans and, by no later than April 1, 2022, transferring any claim proceeds to Plaintiff. *Id.* § 2.05, 4.01, 4.03, 4.04; Morley Decl. ¶¶ 5-7.

12. Section 2.05 of the MLPA entitled Plaintiff to all monies collected or received by Defendant or Defendant's Servicer after the "Cut-off Date" of January 31, 2022, on or relating to the Mortgage Loans, "including without limitation any insurance proceeds . . . ." Ex. A § 2.05,

---

[3] Citations to "Ex. __" refer to the exhibits to the Declaration of Jill L. Forster in Support of Plaintiff's Motion for Summary Judgment, filed concurrently herewith.

[4] Although the MLPA identifies Central Loan Administration and Reporting as Defendant's Servicer, The Money Source, Inc. was the subservicer responsible for performing servicing functions. *See* Third-Party Complaint, dated May 9, 2024 (ECF No. 17).

4

Article I (definition of "Cutoff Date); Ex. EE (Defendant's Response to Request for Admission No. 53).  Specifically, Section 2.05 provided:

> The Purchaser shall be entitled to (a) all principal on the Mortgage Loans received by the Seller (or its designee) or the Purchaser (or its designee) after the Cut-off Date; (b) all payments of interest on the Mortgage Loans received by the Seller (or its designee) or the Purchaser (or its designee) after the Cut-off Date; and (c) all other monies collected or received by the Seller (or its designee) or the Purchaser (or its designee) after the Cut-off Date relating to or in connection with the Mortgage Loans (including without limitation any insurance proceeds, liquidation proceeds and condemnation proceeds).

Ex. A § 2.05.

13.    Sections 4.03 and 4.04 of the MLPA required Defendant to cause its servicer to promptly forward all payments received on account of the Mortgage Loans to Plaintiff no later than April 1, 2022.  Ex. A §§ 4.03, 4.04.  Specifically, Section 4.03 provided that "[a]fter the Servicing Transfer Date [*i.e.*, March 22, 2022], the Seller shall cause the Seller's Servicer to promptly forward all payments or other funds received by the Seller or the Seller's Servicer and owing to the Purchaser on account of the Mortgage Loans to the Purchaser."  Ex. A § 4.03.  Section 4.04 provided that "[a]ll collections on account of or related to the Mortgage Loans after the Cut-off Date through the Servicing Transfer Date shall be deemed held by the Seller's Servicer in trust for Purchaser and remitted to Purchaser within ten (10) business days following the Servicing Transfer Date [*i.e.*, by April 1, 2022]."  Ex. A § 4.04.

14.    Finally, Section 4.01(a) of the MLPA obligated Defendant to ensure that its servicer serviced the Mortgage Loans in accordance with "Accepted Servicing Practices."  Ex. A § 4.01(a).  Specially, Section 4.01(a) provided that, during the Interim Servicing Period, "[t]he Seller shall cause the Seller's Servicer . . . to interim service and administer the Mortgage Loans in accordance with Accepted Servicing Practices . . . ."  Ex. A § 4.01(a).

5

15.     "Accepted Servicing Practices" is defined in the MLPA as "[t]he mortgage servicing practices of prudent mortgage lending institutions and nationally recognized prudent residential mortgage servicers (i) that service mortgage loans for their own or other portfolios which are of the same type as the Mortgage Loans in the jurisdiction where the related Mortgaged Property is located, (ii) that are in compliance with all applicable federal, state and local laws and regulations, including VA Regulations and (iii) that are in compliance the applicable Mortgage and Mortgage Note."  Ex. A Art. I (definition of "Accepted Servicing Practices").

16.     The purchase price paid by Plaintiff included a specified percentage of the principal balance of each Mortgage Loan plus interest accrued on the Mortgage Loans but not yet paid.  Ex. A Art. I (definition of "Purchase Price"); Ex. B (excerpts of the Mortgage Loan Schedule attached as Exhibit A to the MLPA).

## III.    THE INTERIM SERVICING PERIOD

### A.     Defendant's Servicer Engages in Loss Mitigation Efforts for the Subject Loans, Giving Rise to Insurance Claims to Submit to the Relevant Agency

17.     During the Interim Servicing Period (between February 1, 2022 through March 22, 2022), Defendant's Servicer engaged in loss mitigation efforts for the fourteen Mortgage Loans at issue in this action (the "Subject Loans," *i.e.*, the loans identified by TMS Loan Number in paragraphs 19 and 22 *infra*).  *See, e.g.*, *infra* ¶¶ 19-22.

18.     In connection with these efforts, Defendant's Servicer completed loan modifications for thirteen of the Subject Loans and a short sale for one Subject Loan, resulting in a reduction in the principal balance and accrued interest on the Subject Loans and partial claim amounts.  *See, e.g.*, *infra* ¶¶ 19-22; Ex. C (showing a reduction in unpaid principal balance in columns I and J, and partial claim amounts in column O); Exs. D-P (loan modification and partial

claim documents); Exs. Q-BB (Loss Mitigation: Summary Reports); Morley Decl. ¶¶ 11-15; Ex. CC (Advice of Payment, demonstrating claim payments).

19.    As set forth in a "Completed Modifications" chart produced by Defendant, which is excerpted below, the aggregate partial claim amounts for the thirteen Subject Loans where Defendant's Servicer completed loan modifications in the Interim Servicing Period total $952,899.40, as follows:

| [TMS] Loan Number | Loss Mitigation Template Type | Modification Complete Date | Partial Claim Amount |
|---|---|---|---|
| █████6984 | VAREFD | 2/3/2022 | $102,966.91 |
| █████5783 | FHAREC | 2/22/2022 | $51,961.62 |
| █████9824 | FHAREC | 2/22/2022 | $73,070.84 |
| █████1260 | VAREFD | 2/23/2022 | $56,043.36 |
| █████4634 | VAREFD | 2/23/2022 | $117,181.95 |
| █████1389 | FHARCPC | 2/28/2022 | $56,867.53 |
| █████1820 | VAREFD | 2/28/2022 | $70,958.29 |
| █████2216 | FHAREC | 2/28/2022 | $48,666.49 |
| █████1324 | FHAREC | 2/28/2022 | $48,344.10 |
| █████8967 | VAREFD | 3/2/2022 | $128,611.83 |
| █████2661 | FHAREC | 3/11/2022 | $79,416.64 |
| █████0990 | FHAREC | 3/14/2022 | $51,641.20 |
| █████1086 | FHAREC | 3/16/2022 | $67,168.64 |

Ex. C.

20.     Under standard servicing practices, claims should have been filed on these Subject Loans on the next business day after the modification was complete, *i.e.*, between February 4, 2022 and March 17, 2022.  Morley Decl. ¶ 7; Ex. C.  Had this practice been followed, claims would have been filed on the Subject Loans during the Interim Servicing Period.  *Id.*

21.     Documents produced by Defendant in this action further substantiate the claim amounts set forth in Ex. C.  Defendant produced loan modification and partial claim documents for each of these thirteen Subject Loans, together with certain checklists from Defendant's Servicer.  *See* Exs. D-P.  The "Modification Document Intake Checklist" included with these loan modification and partial claim documents includes a row entitled "N/A – PC Check Only" listing the partial claim amount for each of these Subject Loans in amounts matching those listed in Ex. C.  *See id.*[5]  Defendant also produced a "Loss Mitigation: Summary Report" for twelve of these thirteen Subject Loans, listing the same partial claim amount on the last page of each report under either "Total VA Refund Amount" (for VA loans) or "Total (New) Partial Claim Amount" (for FHA loans).  *See* Exs. Q-BB.

22.     For the fourteenth Subject Loan, TMS Loan Number ▮▮▮▮6400, a short sale was held — a foreclosure alternative where the borrower sells the home for less than the balance of the remaining mortgage — resulting in a partial claim of $19,311.67.  *See* Morley Decl. ¶ 14; Ex. CC (Advice of Payment); Ex. DD (Third-Party Defendants' Response to Interrogatory No. 7).

---

[5]     Ex. D (TMS Loan No. ▮▮▮▮6984, at EPM001620); Ex. E (TMS Loan No. ▮▮▮▮5783, at EPM002060); Ex. F (TMS Loan No. ▮▮▮▮9824, at EPM004549); Ex. G (TMS Loan No. ▮▮▮▮1260, at EPM001420); Ex. H (TMS Loan No. ▮▮▮▮4634, at EPM001563); Ex. I (TMS Loan No. ▮▮▮▮1389, at EPM004091); Ex. J (TMS Loan No. ▮▮▮▮1820, at EPM004757); Ex. K (TMS Loan No. ▮▮▮▮2216, at EPM001532); Ex. L (TMS Loan No. ▮▮▮▮1324, at EPM001592); Ex. M (TMS Loan No. ▮▮▮▮8967, at EPM001447); Ex. N (TMS Loan No. ▮▮▮▮2661, at EPM001391); Ex. O (TMS Loan No. ▮▮▮▮0990, at EPM001695); Ex. P (TMS Loan No. ▮▮▮▮1086, at EPM001489).

23.     Accordingly, the total amount of insurance proceeds that should have been received by Plaintiff on account of the fourteen Subject Loans was $972,211.07. *See supra* ¶¶ 17-22. No such amounts were ever transferred to Plaintiff. *See infra* ¶¶ 26-27.

**B.     Defendant Receives, but Fails to
Forward to Plaintiff, Insurance Claim Proceeds**

24.     Defendant's Servicer filed insurance claims for eight of the Subject Loans and the proceeds of those insurance claims were paid to Defendant in the claim amounts listed *supra* ¶¶ 19, 22 — as admitted by Defendant, admitted by Defendant's Servicer, and demonstrated by "Advice of Payment" documents produced in this action. Ex. CC (Advice of Payments, line for "FHA EFT PAYMENT"); Exhibit DD (Third-Party Defendants' Response to Interrogatory No. 7); Exhibit EE (Defendant's Response to Request for Admission Nos. 2, 5, 8, 11, 14, 17, 20, 23); Morley Decl. ¶¶ 13-14. Specifically, Defendant received insurance proceeds of $429,280.09, as follows:

| TMS Loan ID | Date Claim Filed | Date Claim Paid | Claim Amount |
|---|---|---|---|
| ████0990 | 3/23/2022 | 3/24/2022 | $51,641.20 |
| ████5783 | 3/9/2022 | 3/10/2022 | $51,961.62 |
| ████2661 | 3/17/2022 | 3/18/2022 | $79,416.64 |
| ████9824 | 3/2/2022 | 3/3/2022 | $73,070.84 |
| ████2216 | 3/17/2022 | 3/18/2022 | $48,666.49 |
| ████1324 | 3/17/2022 | 3/18/2022 | $48,344.10 |
| ████1389 | 3/17/2022 | 3/18/2022 | $56,867.53 |
| ████6400 | 2/9/2022 | 2/10/2022 | $19,311.67 |

*Id.*

25.    Additional documents produced by Defendant identify that claim proceeds were paid.  For example, for TMS Loan No. ████6400, in an email, Defendant confirmed with Defendant's Servicer that ███████████████████████████████████████████

████████████████████████████████████████████████ Ex. FF; *see also* Ex. GG (document from Defendant titled ████████████████████████

███████████████████████████████████████████████

███████.

26.    Defendant and Defendant's Servicer admit that they did not transfer any of the insurance claim proceeds paid on these eight Subject Loans to Plaintiff.  Ex. EE (Defendant's Response to Request for Admission Nos. 3, 6, 9, 12, 15, 18, 21).

**C.**    **Defendant Fails to Cause its Servicer to Follow Accepted Servicing Practices**

27.    For the remaining six Subject Loans (████1086, ████8967, ████1260, ████1820, ████6984, and ████4634), Defendant's Servicer failed to file and obtain payment on account of the partial claims, which amounted in the aggregate to $542,930.98.  *See, e.g.*, *supra* ¶ 19; Ex. DD (Third-Party Defendants' Response to Interrogatory No. 7); Morley Decl. ¶ 15.

28.    Under accepted servicing practices, Defendant's Servicer should have timely submitted the insurance claims one business day after completing the loan modifications on each of these six Subject Loans — all dates that fell within the Interim Servicing Period.  *See, e.g.*, Morley Decl. ¶ 7; Ex. C (listing modification complete date).  Defendant failed to cause its servicer to follow this accepted servicing practice.  *See id.*; *supra* ¶¶ 19, 27.

29.    Then, as detailed below, Defendant failed to provide any substantive response to Plaintiff's numerous requests for information regarding loss mitigation efforts on the Subject Loans, including whether any claims had been filed on these six Subject Loans.  *See infra* ¶¶ 31-

33. Indeed, Defendant admits that, to this day, it has no knowledge regarding whether Defendant's Servicer filed insurance claims. *See* Ex. EE (Defendant's Response to Request for Admission Nos. 28-29, 32-33, 36-37, 40-41, 44-45, 48-49).

## IV.    THE SERVICING TRANSFER

30.    Defendant's Servicer transferred the servicing of the Mortgage Loans to Plaintiff's Servicer on or about March 22, 2022. Morley Decl. ¶ 11; Ex. EE (Defendant's Response to Request for Admission No. 52, demonstrating that the "Servicing Transfer Date" under the MLPA was March 22, 2022). Following the servicing transfer, as part of its onboarding process, Plaintiff's Servicer noticed that the unpaid principal balances of the Subject Loans at the time of the servicing transfer had been reduced from the balances that were purchased by Plaintiff. *See* Morley Decl. ¶ 11; Exs. HH-II. Plaintiff's Servicer also noticed that the accrued and unpaid interest on the Subject Loans that had been paid by Plaintiff as part of the purchase price had been written down to zero. *See id.*

31.    Upon further review and investigation, Plaintiff's Servicer learned that the Subject Loans had been subject to certain loss mitigation efforts by Defendant's Servicer in the Interim Servicing Period. Morley Decl. ¶ 12. Plaintiff's Servicer determined that insurance claims had been filed and claim proceeds had been paid for some of the Subject Loans, but was unable to determine whether a claim had been filed or paid with respect to others. *Id.* ¶¶ 12-15; Exs. HH-II.

32.    Plaintiff's Servicer's main source of information about the Defendant's Servicer's servicing of the Mortgage Loans was an excel provided to Plaintiff's Servicer by Defendant's Servicer when servicing transferred. Morley Decl. ¶ 17. It was Plaintiff's Servicer's understanding from the information provided by Defendant's Servicer in this excel and follow up with a borrower that (i) a modification had not, in fact, been completed on three of the Reduced

11

Loans such that no partial claim existed to be filed; and (ii) Defendant's Servicer had filed partial claims for three of the Reduced Loans.  *See id.* ¶¶ 17-18; Ex. MM.

33.     On multiple occasions thereafter, Plaintiff's Servicer, Plaintiff, and Plaintiff's counsel demanded payment of the partial claim proceeds that Defendant had failed to forward to Plaintiff and requested detail from Defendant regarding loss mitigation activities on the Subject Loans, including the status of any partial claims filed by Defendant's Servicer with the appropriate agency.   *See, e.g.*, Morley Decl. ¶¶ 12, 16-18; Exs. HH-LL.  Neither Defendant nor Defendant's Servicer ever provided Plaintiff a substantive response to these requests.  *Id.*


 Dated:  December 4, 2025
         New York, New York

                                        PALLAS PARTNERS (US) LLP


                                        By: */s/ Jill L. Forster*
                                        Michael A. Hanin
                                        Jill L. Forster
                                        75 Rockefeller Plaza
                                        New York, NY 10019
                                        Telephone: (212) 970-2300
                                        michael.hanin@pallasllp.com
                                        jill.forster@pallasllp.com

                                        *Attorneys for Plaintiff*