UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
STANWICH MORTGAGE ACQUISITION
COMPANY VIII, LLC,

                                 Plaintiff,

       -against-

EQUITY PRIME MORTGAGE, LLC,

                                 Defendant.
-----------------------------------------------------------------X
EQUITY PRIME MORTGAGE, LLC,

                             Third-Party Plaintiff,

       -against-

THE MONEY SOURCE INC. and
SERVBANK, SB,

                             Third-Party Defendants.
-----------------------------------------------------------------X

Docket No.: 1:24-cv-00771-DEH

**DEFENDANT/THIRD-PARTY PLAINTIFF, EQUITY PRIME MORTGAGE'S, RESPONSE TO THIRD-PARTY DEFENDANTS THE MONEY SOURCE INC. AND SERVBANK, N.A.'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

Third-Party Defendant/Plaintiff, Equity Prime Mortgage ("EPM") here by responds to Third-Party Defendants, The Money Source Inc. ("TMS") and Servbank, N.A. ("Servbank"), statement of undisputed material facts pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56.1 as follows:

I.    The Parties and Relevant Agreements

1.    Plaintiff Stanwich Mortgage Acquisition Company VIII, LLC ("SMAC") is the purchaser of a pool of residential mortgage loans from Equity Prime Mortgage, LLC ("EPM") pursuant to a Mortgage Loan Purchase Agreement dated February 1, 2022 (the "MLPA"). (Ex. A, SMAC Compl. ¶¶ 1-2, 13-14.)[1]

**RESPONSE: ADMIT**

2.    EPM is the seller under the MLPA and the defendant/third-party plaintiff in this action. (Ex. A ¶ 14; Ex. B, Third-Party Complaint ¶¶ 1-3, 9.)

**RESPONSE: ADMIT**

3.    TMS is a residential mortgage loan subservicer that, during the period relevant to SMAC's claims, subserviced certain EPM loans pursuant to a subservicing agreement dated November 1, 2019 (the "2019 Subservicing Agreement"). (Ex. C, 2019 Subservicing Agreement at 1 (Recitals).)

**RESPONSE: ADMIT**

4.    Servbank is a bank that, effective April 1, 2023, became EPM's subservicer

---

[1]    All Exhibits referenced herein are attached to the Declaration of Colleen O'Neil ("O'Neil Decl.").

under an Amended and Restated Subservicing Agreement (the "2023 Subservicing Agreement"), which amended and restated the 2019 Subservicing Agreement after it was assigned to Servbank from TMS. (Ex. D, 2023 Subservicing Agreement at 1 (Preamble), 2 (Recitals).)

**RESPONSE**: **ADMIT**

II.      The MLPA and the Fourteen Subject Loans

5.      Under the MLPA, EPM sold to SMAC, among other things, a group of residential mortgage loans identified on a final mortgage loan schedule. The fourteen loans that are the subject of SMAC's damages theory are referred to herein as the "Subject Loans." (Ex. A ¶ 14, nn. 2-3.)

**RESPONSE: ADMIT**

6.      The MLPA establishes a "Cut-Off Date" of January 31, 2022 and an "Interim Servicing Period" beginning February 1, 2022, during which EPM continued to service, or cause to be serviced, the Subject Loans. (Ex. A ¶ 17; Ex. E, EPM Responses to SMAC's First RFAs Nos. 52-53.)

**RESPONSE: ADMIT**

7.      SMAC alleges that, under the MLPA, EPM was required during the Interim Servicing Period to ensure that its servicer adhered to accepted servicing practices and to cause principal and interest, accrued interest, and FHA/VA/USDA insurance proceeds on the Subject Loans to be remitted to SMAC within a specified time after servicing transferred. (Ex. A ¶¶ 18- 21.)

**RESPONSE: DENY.**

8. SMAC further alleges that it did not receive (i) the benefit of the principal and interest reductions on the Subject Loans and (ii) certain government-insurance claim proceeds, and that EPM thereby breached the MLPA. (Ex. A ¶¶23-25.)

**RESPONSE: DENY**

III. The 2019 Subservicing Agreement Between EPM and TMS

9. Separate from the MLPA, EPM and TMS entered into a Subservicing Agreement dated November 1, 2019. (Ex. C at 1 (Preamble).)

**RESPONSE: ADMIT**

10. Under the 2019 Subservicing Agreement, EPM is the "Owner/Servicer" and "Investor" of the loans, and TMS is the "Subservicer." (Ex. C at 1 (Preamble), § 1 (definitions of "Owner/Servicer," "Investor," and "Subservicer").)

**RESPONSE: ADMIT**

11. The 2019 Subservicing Agreement requires TMS to service loans in accordance with "Applicable Requirements," a term that includes, among other things, federal agency regulations and guides applicable to FHA and VA loans. (Ex. C §§ 1 (definition of "Applicable Requirements"), 2.1-2.2.)

**RESPONSE: ADMIT**

12. The 2019 Subservicing Agreement requires TMS, among other things, to perform servicing functions on EPM's behalf, including collecting payments, maintaining required insurance, and accounting for and remitting to EPM amounts due to EPM as Investor. (Ex. C §§ 2.4-2.6.)

**RESPONSE: ADMIT**

13. The 2019 Subservicing Agreement further provides that, when EPM sells or

assigns its interests in a mortgage loan to a third-party purchaser, TMS will make direct remittances to that third-party only where (a) the subservicing arrangement remains in effect and (b) EPM has provided written notice and instructions identifying the purchaser. (Ex. C § 2.6 (Accounting and Investor Reporting).)

**RESPONSE: ADMIT**

14.    The 2019 Subservicing Agreement contains an indemnification provision that addresses when, and under what circumstances, TMS may be obligated to indemnify EPM for third-party claims, including claims by investors or purchasers. (Ex. C § 8.2(B) (Subservicer Indemnity).)

**RESPONSE: ADMIT**

IV.    The 2023 Subservicing Agreement and Servbank's Limited Role

15.    Effective April 1, 2023, EPM and Servbank entered into an Amended and Restated Subservicing Agreement (the "2023 Subservicing Agreement"), which amended and restated the 2019 Subservicing Agreement and recites that the prior agreement "was assigned to Subservicer from The Money Source Inc. effective April 1, 2023." (Ex. D at 1-2 (Preamble, Recitals).)

**RESPONSE: ADMIT**

16.    The 2023 Subservicing Agreement governs Servbank's subservicing of EPM's loans on and after April 1, 2023, on a going-forward basis. (Ex. D at Art. 2.; Servbank Declarant Decl. ¶ 8.) The 2023 Subservicing Agreement was not an asset-purchase transaction. Servbank did not purchase TMS's servicing platform, did not acquire TMS's pre-existing liabilities, and did not assume responsibility for TMS's pre-transfer conduct on loans that were no longer on EPM's platform. (Servbank Declarant Decl. ¶ 8.)

10

**RESPONSE: ADMIT**

17.     The MLPA between SMAC and EPM closed in early 2022, and servicing of the Subject Loans transferred from EPM's servicing platform to SMAC's chosen servicer, Carrington Mortgage Services, LLC ("Carrington"), in or around March 2022—more than a year before the effective date of the 2023 Subservicing Agreement. (Ex. A ¶ 22; Ex. F, March 22, 2022 email enclosing Encrypt 2022-01 Equity Prime Mortgage (2019-8 Upsize) (02.-1.22) Day 1 reports.)

**RESPONSE: ADMIT.**

18.     Servbank did not subservice the Subject Loans during the Interim Servicing Period, did not process any FHA or VA claims on the Subject Loans, and has never received any of the government-insurance claim proceeds that SMAC contends were not forwarded to it. (Servbank Decl. ¶¶ 4-8.)

**RESPONSE: UNABLE TO CONFIRM OR DENY.**

V.     HUD/FHA Claim Payment Mechanics

19.     For FHA-insured loans, FHA claim payments are disbursed by electronic funds transfer (EFT) to the mortgagee's designated FHA account, and not to the servicer. (TMS Decl. ¶ 4.)

**RESPONSE: ADMIT**

20.     In the ordinary course, TMS does not receive FHA claim proceeds in its own name; instead, any approved claim is paid by HUD directly to the mortgagee identified on the FHA case—in this instance, EPM. (TMS Decl. ¶ 5.)

**RESPONSE: ADMIT**

VI.     The Interim Servicing Period and Transfer of the Subject Loans

21.     Under the MLPA, the Cut-Off Date for the Subject Loans was January 31, 2022, and the Interim Servicing Period ran from February 1, 2022 until on or about March 22, 2022, when servicing transferred away from EPM's platform. (Ex. A ¶¶ 17, 22; Ex. E, Resp. Nos. 52-53.)

**RESPONSE: ADMIT**

22.     During the Interim Servicing Period, the Subject Loans remained on EPM's servicing platform, with TMS acting as subservicer pursuant to the 2019 Subservicing Agreement. (Ex. A ¶ 18; Ex. C at 1 (Preamble); TMS Decl. ¶ 3.)

**RESPONSE: ADMIT**

23.     On or about March 22, 2022, servicing of the Subject Loans transferred from EPM's servicing platform to SMAC's chosen servicer, Carrington. (Ex. A ¶ 22; Ex. F; TMS Decl. ¶ 3.)

**RESPONSE: ADMIT**

24.     In connection with that servicing transfer, TMS provided Carrington with "Day 1" transfer reports and servicing-release data for the loans in the 2019-8 pool, which identified, among other things, loans in active loss-mitigation status. (Ex. F.)

**RESPONSE: ADMIT**

25.     From that point forward, Carrington was responsible for ongoing servicing of the Subject Loans and, where appropriate, for the filing of any remaining FHA or VA insurance claims. (Ex. F; TMS Decl. ¶ 12.)

**RESPONSE: ADMIT**

VII.    Eight Subject Loans with FHA Partial-Claim or Short-Sale Payments (the "Claim Loans")

26.     Eight of the fourteen Subject Loans were the subject of FHA partial-claim or

10

short- sale claims that were filed and processed while TMS was subservicing the loans for EPM (the "Claim Loans"). (Ex. G, HUD Advice of Payment ("AOP") records.)

**RESPONSE: ADMIT**

27.    For each of the Claim Loans, FHA issued an AOP identifying, among other things, the FHA case or loan number, Equity Prime Mortgage LLC ("EPM") as the mortgagee, The Money Source Inc. ("TMS") as the servicer, and the amount of the claim payment. (Ex. G.)

**RESPONSE: ADMIT**

28.    The AOPs reflect that FHA remitted each claim payment by electronic funds transfer ("EFT") as an "FHA EFT Payment" in the stated amount. (Ex. G.)

**RESPONSE: ADMIT**

29.    In the ordinary course, FHA claim payments on these loans were disbursed by HUD via EFT directly to EPM, as mortgagee, to EPM's designated FHA account, and not to TMS; TMS did not receive or hold the FHA claim proceeds for the Claim Loans. (Ex. G.; TMS Decl. ¶¶ 5-8.)

**RESPONSE: ADMIT**

30.    In its responses to SMAC's Requests for Admission, EPM admits that, after the Cut-Off Date, it received deposits in the exact amounts of the seven FHA partial-claim payments identified in the AOPs (Loan Nos. xxxxx0990, xxxxx5783, xxxxx2661, xxxxx9824, xxxxx2216, xxxxx1324, xxxxx1389), but states that it is "unable to determine the source" of those funds. (Ex. E, EPM Responses to SMAC's First RFA Nos. 2, 5, 8, 11, 14, 17, 20.)

**RESPONSE: ADMIT**

31.    In those same responses, EPM admits that it did not remit any funds to SMAC

after the Cut-Off Date in connection with each of the seven partial-claim Claim Loans. (Ex. E, EPM Responses to SMAC's First RFA Nos. 3, 6, 9, 12, 15, 18, 21.)

**RESPONSE: DENY**

32.    As to the eighth Claim Loan—a short-sale/pre-foreclosure claim for Loan No. xxxxx6400—FHA issued an AOP reflecting an "FHA EFT Payment" of $19,311.67 to EPM as mortgagee. (Ex. G (TMS0021-22).) In its RFA responses, EPM denies that it received a $19,311.67 deposit after the Cut-Off Date but nevertheless admits that it did not remit any funds to SMAC after the Cut-Off Date in connection with the loan. (Ex. E, EPM Responses to SMAC's First RFAs Nos. 23-24.)

**RESPONSE: DENY**

VIII.    The Remaining Six Subject Loans Were In Loss Mitigation and Had No Insurance Claim Payments Before Transfer (the "In-Flight Loans")

33.    The remaining six Subject Loans (the "In-Flight Loans") were in active FHA or VA loss-mitigation status as of the March 2022 servicing transfer (Loan Nos. xxxxx1086, xxxxx8967, xxxxx1260, xxxxx1820, xxxxx6984, xxxxx4634). TMS's March 21, 2022 "Loss Mitigation for Service Transfers" report for the 2019-8 sale identifies those loans as subject to FHA Recovery Modifications, FHA COVID Recovery options, or VA refund/forbearance options. (Ex. H, TMS0001-13; TMS Decl. ¶¶ 9-10.)

**RESPONSE: ADMIT**

34.    For each of the In-Flight Loans, the available servicing data reflect that no FHA or VA insurance claim had been filed and no FHA or VA claim proceeds had been paid as of the March 2022 servicing transfer. There are no HUD AOP records for the six In-Flight loan numbers, and TMS's servicing records show no FHA or VA claim disbursements on those loans prior to transfer. (Ex. G, AOP records; Ex. H, TMS0001-13; TMS Decl. ¶ 11.)

**RESPONSE: ADMIT**

35.    Neither EPM nor SMAC has produced any FHA, VA, USDA, or other government- insurance claim payment documentation for the In-Flight Loans in discovery. (O'Neil Decl. ¶ 13.)

**RESPONSE: ADMIT**

36.    SMAC relies on an Excel file produced in discovery and labeled SMAC0000225, which lists "LTSH Step Descriptions" and completion dates for the In-Flight Loans. For certain In-Flight Loans, the descriptions include notations such as "PC DOCS SENT 4 RECORDING; 4WARDED 2 CLAIMS DEPT; LOAN REINSTATED BY LM"; for others, they include "TITLE CLEAR – FINAL," "DECISION RENDERED; MODIFICATION TO BORROWER," or "RECVD MOD DOCS." (Ex. I (excerpt of SMAC0000225).)

**RESPONSE: ADMIT**

37.    In its pre-motion letter, SMAC contends that these internal "step descriptions" show that EPM's servicer "failed to successfully file Claims" on the In-Flight Loans and that alleged deficiencies in the transfer information prevented SMAC's servicer from later filing such claims. (Ex. J, SMAC Pre-Motion Letter at 2.) TMS disputes that characterization. (TMS Decl. ¶15.)

**RESPONSE: ADMIT**

38.    Regardless of SMAC's characterization of its internal codes, it is undisputed that (i) no FHA or VA insurance claims had been filed on the In-Flight Loans as of the March 2022 transfer, and (ii) no FHA or VA claim proceeds on those loans have ever been paid to TMS or Servbank. (Exs. F-H; TMS Decl. ¶ 16.)

**RESPONSE: ADMIT**

IX.    EPM's Third-Party Complaint Against TMS and Servbank

39.    After SMAC filed its complaint against EPM, EPM commenced a third-party action against TMS and Servbank (the "Third-Party Complaint"). (Ex. B.)

**RESPONSE: ADMIT**

40.    The Third-Party Complaint asserts a single cause of action for breach of contract against TMS and Servbank, based on the parties' subservicing agreements. (Ex. B ¶¶ 31-37.)

**RESPONSE: ADMIT**

41.    EPM alleges, in substance, that if it is "determined that insurance proceeds for the identified mortgage loans were improperly withheld from SMAC," then such withholdings would be "in violation of TMS' obligations under the Agreement, which requires TMS to make all remittances to any third-party purchaser within 30 days," and that TMS should be held liable to EPM if EPM is held liable to SMAC. (Ex. B ¶¶ 28-30, 34-35.)

**RESPONSE: ADMIT**

42.    The Third-Party Complaint does not assert any separate failure-to-file-claims theory, does not allege a "bad transfer" of loss-mitigation or claim information, does not plead common-law indemnity or contribution, and does not assert fraud, willful misconduct, or negligence against TMS or Servbank. (Ex. B ¶¶ 28-37.)

**RESPONSE: DENY**

43.    The only damages EPM seeks in the Third-Party Complaint are derivative and contingent: (a) "an amount to be determined at trial for the alleged failure to forward certain agency backed mortgage loan insurance proceeds to SMAC," and (b) "attorneys' fees and costs that EPM has incurred as a result of having to defend against Plaintiff's claims and bringing this

Third-Party Complaint." (Ex. B.)

**RESPONSE: DENY**

44. As to Servbank, the Third-Party Complaint alleges only that "Servbank, as a successor of TMS, is liable to EPM for TMS's breach" and does not allege any independent conduct by Servbank relating to the servicing of the Subject Loans, the filing or processing of claims, or the receipt of claim proceeds. (Ex. B ¶ 36.)

**RESPONSE: ADMIT**

45. The Third-Party Complaint does not allege that Servbank expressly or impliedly assumed any pre-existing liabilities of TMS to EPM, does not allege that any transaction between TMS and Servbank constituted a merger or consolidation, and does not allege that Servbank is a "mere continuation" of TMS or that any transfer between TMS and Servbank was undertaken to defraud creditors. (Ex. B ¶¶ 28-37.)

**RESPONSE: DENY THE CHARACTERIZATION**

46. The 2023 Subservicing Agreement recites that the 2019 Subservicing Agreement "was assigned to Subservicer from The Money Source Inc effective April 1, 2023" and sets forth the Servbank's rights and obligations with respect to EPM's loans on and after that date. It does not state that Servbank assumes responsibility for TMS's past conduct or for liabilities arising from TMS's subservicing of loans that were no longer on EPM's platform as of April 1, 2023. (Ex. D at 1-2, §§ 2.1-2.22.)

**RESPONSE: EPM REFERS TO THE AGREEMENT REFERENCED THEREIN AND DEFERS ALL MATTER OF CONTRACTUAL INTERPRETATION TO THE HONORABLE COURT.**

47. TMS continues to exist as a separate corporate entity following the April 1, 2023 assignment, and Servbank operates as a distinct legal entity. Servbank did not acquire all of TMS's assets or operations, and TMS did not cease to exist as part of any transaction relating

10

to the 2023 Subservicing Agreement. (TMS Decl. ¶ 17; Servbank Decl. ¶9.)

**RESPONSE: EPM DENIES THE ABOVE AND SUBMITS THAT SERVBANK HAS ASSUMED THE TMS'S OPERATIONS.**

48.    In discovery, EPM has not identified any agreement, corporate document, or testimony stating that Servbank expressly assumed TMS's pre-April 1, 2023 liabilities to EPM, or any document suggesting that a merger, de facto merger, "mere continuation," or fraudulent transfer occurred between TMS and Servbank with respect to the Subject Loans. (O'Neil Decl. ¶ 14.)

**RESPONSE: DENY THAT SUCH RECORDS WERE EVER REQUESTED FROM THIRD-PARTY DEFENDANTS' DURING THE DISCOVERY PERIOD.**

Dated: January 23, 2026
        Uniondale, New York

                                    FORCHELLI DEEGAN TERRANA LLP

                                    By: __/s/_____
                                    Keith J. Frank, Esq.
                                    Lisa M. Casa, Esq.
                                    333 Earle Ovington Blvd., Suite 1010
                                    Uniondale, New York 11553

10